**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HELENA K. DAVINCI,** | : | **Civil No. 1:11-CV-1470** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Caldwell)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **MICHAEL J. ASTRUE,** | : | |
| **COMMISSIONER OF** | : | |
| **SOCIAL SECURITY** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.      Statement of Facts and of the Case

#### A.      Introduction

In this case, the Plaintiff, Helena DaVinci, appeals from what was, on balance, a highly favorable decision granting her claim for social security benefits, effective July 20, 2008, based upon a combination of factors and most notably the onset of severe osteoarthritis in her hip.  While this ruling was favorable to DaVinci, the Plaintiff nonetheless appeals, arguing that the Administrative Law Judge erred in refusing to grant her request for an earlier onset of her disability, based upon mental, emotional and psychiatric disabilities.  Thus, the issue before this Court on appeal is whether the Administrative Law Judge who considered this case adequately

1

considered and accounted for these mental, emotional and psychiatric impairments when granting this claim for benefits and setting the onset of disability at July 2008. Finding on the record as a whole that these impairments were adequately considered, and that there is substantial evidence supporting the ALJ determination of the issue of when DaVinci first became disabled, we recommend that the judgment of the ALJ be affirmed.

### B.   DaVinci's Mental State

With respect to the sole contested issue presented in this appeal–the degree to which Helena DaVinci's mental state compelled a finding of an earlier onset to her disability–the evidence presented in these proceedings concerning DaVinci's impairments had a highly mixed, equivocal and contradictory quality.

Helena DaVinci was born in 1964, and was 46 years old at the time of the ALJ's decision in this case.  (Tr. 22, 35, 85.)  DaVinci completed twelfth grade in 1982, and while in high school her school records had assessed her IQ at 119.  (Tr. 285, 342.)  Over the past fifteen years, DaVinci held a number of jobs, working as an office manager, a word processor in a pharmaceutical marketing/research company, and in customer service and management in various retail stores.  (Tr. 56-57, 237, 254-66.)  Most recently, in 2006 she was employed by Giant Food, and in early 2007 she briefly worked for Abel Personnel, Inc. and AC Moore.  (Tr. 57-58, 212.)  From

late 2007 through March of 2008 Plaintiff worked for Capital Delivery Systems as an independent contractor, and earned nearly $4,000.  (Tr. 220.)

With respect to her mental and emotional state, DaVinci claimed that she had become disabled in March of 2006 due to a combination of ailments including anxiety, depression, ADHD, and short term memory loss, triggered in part by a fall she had suffered.  (Tr. 232, 236.)  The medical record relating to this mental and emotional disability claim is mixed.  Indeed, DaVinci's own account of the disabling impact of these conditions is itself contradictory.  For example, DaVinci's claims of mental and emotional disability was supported by her hearing testimony where she testified that after a fall she experienced forgetfulness and anxiety, stating that she could not work or go to the store due to her anxiety, and that her condition became worse over time.  (Tr. 39, 68, 73.)  Yet, DaVinci also acknowledged confusion relating to the onset of this condition, stating that her anxiety predated her accident and was not related to any injuries suffered in this accident.  (Tr. 60-63, 67-68.) DaVinci then  testified that her medications help with this condition, but not enough for her to go to the store, (Tr. 71.), while conceding that she was still well enough to make and sell jewelry, activities which required significant concentration.  (Tr. 72.) DaVinci further acknowledged engaging in a wide range of light activities at home,

stating that she lived with her boyfriend, performed some chores and housekeeping, and was able to drive.  (Tr. 68.)

The very equivocal nature of DaVinci's psychological symptoms was further underscored by function reports completed by DaVinci in October of 2007 and June of 2008, describing her daily activities.  (Tr. 266-76, 301-09.)  In these reports, DaVinci stated that she spent time watching TV, reading, meditating, writing in her journal, caring for a pet, washing dishes, cleaning laundry, vacuuming, and going for walks.  (Tr. 267, 302.).  DaVinci denied any problems with personal care, except some weight gain and poor appetite; (Tr. 268, 303.), acknowledged that she prepared her own meals, such as frozen dinners, cereal, and fruit; (Tr. 269, 304.), and stated that she shopped for groceries in stores approximately once a week for an hour.  (Tr. 270.)  According to DaVinci, she also was able to maintain her hobbies of jewelry making, drawing and painting, cross-stitching, and music despite these emotional difficulties.  (Tr. 271.)  Finally, DaVinci's activity reports indicated that she was able to sustain some level of social interaction despite her anxiety disorder, and stated that she visited her sister, went outside once a day, was able to go out alone, spent time

4

with others talking, shopping, and drove two to three times a week.  (Tr. 302, 305, 306.)[1]

Clinical data amassed during these proceedings also contained contradictory indications regarding DaVinci's mental state, and the disabling effect of her mental state upon the Plaintiff.  During this time period, DaVinci received mental health treatment from Daikon Family Life Services (Daikon) and Sadler Health Clinic Corp.  This treatment consisted largely of medication management.  (Tr. 350-74, 395-484, 564-627.)  Treatment notes for DaVinci from January 2007 through September 2007, indicated that she generally presented a normal appearance with good hygiene, no suicidal or homicidal ideation, displayed an intact memory and was coherent, but also was suffering from restlessness, anxiety, and distraction.  (Tr. 431, 433, 434-38, 440,

---

[1]Function reports from DaVinci's immediate family also presented a mixed picture, with family members describing disability, while reciting facts which demonstrated some residual capacity for work.  For example, in October of 2007, Plaintiff's brother, Joseph King, completed a function report, (Tr. 245), in which he explained that he saw DaVinci only at holiday gatherings, and also reported that she watched TV, made bead bracelets, and went for walks.  (Tr. 245.)  He reported that she had no problem with personal care, could prepare her own meals, and cleaned laundry.  (Tr. 246-47.)  In June of 2008, Plaintiff's sister reported that she and Plaintiff spent a lot of time together helping each other with daily/weekly errands, and chores.  (Tr. 311.)  Plaintiff's sister stated that Plaintiff cared for her guinea pig, had no problems with personal care, prepared her own meals, performed household chores, went out alone, shopped in stores, and engaged in hobbies such as cross-stitching, beading, reading, and watching TV. (Tr. 311-15.)

450.  From January through September of 2007, DaVinci's Global Assessment of Functioning (GAF) Score ranged from 55-60.  (Tr. 430-50.)[2]

On October 11, 2007, John Mira, M.D., issued a narrative report on Plaintiff's psychiatric status (Tr. 366-67.) and a check-box statement regarding Plaintiff's work-related abilities.  (Tr. 362-65.)  On the check box form, Dr. Mira checked boxes stating that DaVinci had marked limitations in interacting with others, handling work pressure, and adjusting to changes in the work setting.  (Tr. 364.)  Dr. Mira's narrative report stated that Plaintiff had depression and persistent anxiety if she did not take her medication.  (Tr. 366.)  He described DaVinci's thinking as disorganized but stated that she was pleasant, attractive, appropriately dressed, and appeared her age.  (Tr. 366-67.)  Dr, Mira further found that DaVinci talked excessively and gave tangential information, but did not have a flight of ideas and simply needed to express a lot of information in a short time.  (Tr. 367.)  Yet, while Dr. Mira's check box form indicated that DaVinci was disabled, he opined that DaVinci's GAF score was 60,

---

[2]The "GAF" scale ranges from a rating of zero to 100, and is divided into ten ranges which consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, 32-35 ("DSM-IV") (4th ed. American Psychiatric Association 1994). A GAF score from 51-60 indicates moderate symptoms, while a GAF score of 61-70 indicates transient and expected reactions to psychosocial stressors. Id.

(Tr. 367), a score which was consistent with only moderate psycho-social difficulties. In March, 2008, Dr. Mira repeated these conclusions when he completed an employability assessment form for the Pennsylvania Department of Public Welfare, which indicated that DaVinci would be temporarily disabled for 12 months or more. (Tr. 393-94.)

Other contemporaneous medical assessments reached conflicting conclusions in the Fall of 2007. For example, on November 13, 2007, Soraya Amanullah, Ph.D., a state agency physician, completed a mental residual functional capacity assessment for DaVinci, which found that she suffered from moderate limitations in some areas, and was not significantly limited in other categories of personal functioning. (Tr. 375-78.) Dr. Amanullah specifically found that DaVinci was able to achieve symptom reduction through treatment, and her progress notes showed good hygiene, euthymic mood, appropriate affect, coherent thought processes, and intact memory. (Tr. 377.) While conceding that DaVinci was not able to handle complex or detailed instructions, this assessment found that her basic memory processes were intact, (Tr. 377.), since she continued to be able to make jewelry, cross-stitch, read, and go shopping for hours. (Tr. 377.)

During 2008, medical professionals continued to reach varying conclusions regarding the extent of DaVinci's emotional disability. For example, in January and

February of 2008, medical records reflect that DaVinci exhibited restlessness and difficulty organizing tasks and activities, but also note that her appearance was normal, her hygiene was good, her affect was appropriate, her mood was euthymic, her thought process was coherent, and her memory was intact. (Tr. 456, 458.) Accordingly, DaVinci was assessed a GAF of 60. (Tr. 459.) In April 2008, DaVinci's GAF score remained at 60 with coherent thought processes and intact memory, but she exhibited restless motor behavior and labile affect along with difficulty organizing tasks and activities. (Tr. 461-62.) However, in May 2008, her Prozac prescription increased and her behavior was calm with attention and concentration within normal limits. (Tr. 463-64.) By June 2008, her GAF score increased to 65, a level consistent with only mild impairment. (Tr. 585-86.)

It was against this backdrop of clinical records documenting some improvement in her condition that on July 9, 2008, Mitchell Sadar, Ph.D., a state agency physician, issued a mental residual functional capacity assessment finding that DaVinci was not significantly limited or moderately limited in every category of functioning. (Tr. 485-502). Dr. Sadar observed that DaVinci's progress notes showed a positive response to treatment with relatively intact mental status. (Tr. 487.) He found that her memory intact and concluded that she could perform basic, routine work. (Tr. 487.)

8

Despite these assessments of her capacity in 2007 and 2008, there is evidence which shows that DaVinci had over the years suffered some significant diminution of her mental acuity. Specifically, on August 26, 2008, William Thomas, M.S., completed a psychological evaluation at the referral of Plaintiff's attorney for the purpose of her Social Security appeal. (Tr. 508-10.) That assessment found DaVinci's IQ to be 85 or 86, (Tr. 509.), and noted that her school records included an IQ score of 119, but that her classroom performance was not commensurate with that score. (Tr. 510.)

## C. **Procedural History**

On the basis of this mixed medical record, DaVinci applied for social security disability benefits in April 2007, initially alleging an onset of disability of date of March 2006, an onset date which she later amended to October, 2007. (Tr. 23, 85.) This claim was denied in administrative review, and DaVinci filed a request for a hearing before an ALJ.

That hearing was initially held June 9, 2009. (Tr. 26.) Following that initial hearing, on September 8, 2009, the ALJ issued a decision denying DaVinci's application for benefit. (Tr. 89.) DaVinci requested review of this decision by the Appeals Council, which May 26, 2010, remanded the case back for further proceedings, which were conducted by another ALJ. (Tr. 102.)

9

That second hearing was conducted on September 1, 2010. (Tr. 25-51.) At this hearing the ALJ heard testimony from Dr. Scott, who testified regarding the disabling effect of DaVinci's osteoarthritis, and placed the onset of that disability with a reasonable degree of medical certainty in July of 2008. (Tr. 32.) The ALJ also heard Ms. DaVinci's testimony concerning her ailments, and received testimony from a vocational expert, who described positions in the national economy which were available to persons suffering from limitations like those which afflicted Ms. DaVinci. (Tr. 35-51.)

On October 1, 2010, the ALJ issued a favorable decision in DaVinci's case, awarding her benefits with an onset of disability date of July 20, 2008, the date upon which Dr. Scott opined that DaVinci's osteoarthritis became disabling. (Tr. 6-22.) The ALJ declined, however, to extend that onset date back to October 2007, as requested by DaVinci, finding that the mixed and equivocal medical evidence, coupled with DaVinci's own occasionally contradictory accounts of her level of activity, did not support a finding that she was disabled due to emotional ailments prior to July 2008. (Id.) In reaching this conclusion the ALJ specifically considered the opinions of all medical witnesses, and carefully examined the opinions tendered by DaVinci's treating physician, Dr. Mira, but found that objective test data and Dr.

10

Mira's own clinical observations, indicated that DaVinci had retained a limited residual capacity to perform work.  (Id.)

DaVinci then renewed her request for review before the Appeals Council, challenging that aspect of the ALJ's favorable decision which declined to set an even more favorable onset date for her disability claims.  That request was denied on June 2, 2011, (Tr. 1.), and this appeal followed.

The parties have now fully briefed this matter,  and this case is now ripe for resolution.  For the reasons set forth below, we find that substantial evidence supports the ALJ findings in this case; that those findings are adequately explained on the record; and that the findings reflect an appropriate assessment of all of the medical evidence.  Therefore, it is recommended that this appeal be denied.

## II.   Discussion

### A.   Standards of Review–The Roles of the Administrative Law Judge and This Court

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the administrative law judge (ALJ) and this Court.  At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits.  To receive disability benefits, a claimant must present

evidence which demonstrates that the claimant has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits.  See 20 C.F.R. § 404.1520. See also Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  If the ALJ finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  See 20 C.F.R. § 404.1520.  As part of this analysis the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.   See 20 C.F.R. § 404.1520. This disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he is unable to engage in past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

In addition to this general analytical framework: "The Commissioner has supplemented this sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a.  These procedures require the hearing officer (and ALJ) to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record, in order to determine if a mental impairment exists.  20 C.F.R. § 404.1520a(b)(1).  If an impairment is found, the examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. § 404.1520a(b)(2).  The examiner must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work.  If the

mental impairment is considered 'severe', the examiner must then determine if it meets a listed mental disorder.  § 404.1520a(c)(2).  If the impairment is severe, but does not reach the level of a listed disorder, then the examiner must conduct a residual functional capacity assessment.  § 404.1520a(c)(3)." Plummer v. Apfel, 186 F.3d 422, 428-29 (3d Cir. 1999).  As part of this evaluative process, "the Commissioner's own regulations require the Commissioner to 'conduct a particularized assessment of an individual's ability in evaluating claims of stress and mental illness.'  See Walls v. Barnhart, 2002 WL 485641, at *19 (E.D.Pa. Mar.28, 2002)." Corona v. Barnhart, 431 F. Supp. 2d 506, 515 (E.D. Pa. 2006).

Moreover, where a disability determination turns on an assessment of the level of a claimant's subjective reports of incapacitation, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  Cases involving an assessment of subjective reports of incapacitation "obviously require[ ]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Id.

In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's pain. Instead. at the outset, by statute the ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence. . . , would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's

15

ability to work.  20 C.F.R. § 404.1529(b).  In so doing, the medical evidence of record

is considered along with the claimant's statements.  20 C.F.R. § 404.1529(b).  Social

Security Ruling 96-7p gives the following instructions in evaluating  the credibility

of the claimant's statements regarding his symptoms:  "In general, the extent to which

an individual's statements about symptoms can be relied upon as probative evidence

in determining whether the individual is disabled depends on the credibility of the

statements.  In basic terms, the credibility of an individual's statements about pain or

other symptoms and their functional effects is the degree to which the statements can

be believed and accepted as true.  When evaluating the credibility of an individual's

statements, the adjudicator must consider the entire case record and give specific

reasons for the weight given to the individual's statements."  SSR 96-7p. SSR 96-4p

provides that "Once the existence of a medically determinable physical or mental

impairment(s) that could reasonably be expected to produce the pain or other

symptoms alleged has been established on the basis of medical signs and laboratory

findings, allegations about the intensity and persistence of the symptoms must be

considered with the objective medical abnormalities, and all other evidence in the case

record, in evaluating the functionally limiting effects of the impairment(s)."  SSR 96-

4p.

16

The ALJ's disability determination must also meet certain basic procedural and substantive requisites.   Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination.   Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).   Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.   Id. at 706-707.   In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

Once the ALJ has made a disability determination, it is then the responsibility of this Court to independently review that finding.   In undertaking this task, this Court applies a specific, well-settled and carefully articulated standard of review.   In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying Plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). When reviewing the denial of disability benefits, we must simply determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); see also Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)." Johnson, 529 F.3d at 200. See also Pierce v. Underwood, 487 U.S. 552 (1988). It is less than a preponderance of the evidence but more than a mere scintilla of proof. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)(quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the

18

evidence does not prevent [the decision] from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

## B. The ALJ's Decision Was Supported By Substantial Evidence

Judged against this deferential standard of review we find that the ALJ's October 15, 2010, disability onset decision in this case, which was generally highly favorable for DaVinci, is supported by "substantial evidence" and, therefore, may not now be disturbed. As we have noted, that decision involved an assessment of conflicting and equivocal medical evidence relating to DaVinci's mental state. Much

19

of this conflicting evidence came from DaVinci's own treating health care providers. For example, treatment notes for DaVinci from January 2007 through Sepetember 2007, indicated that DaVinci generally presented a normal appearance with good hygiene, no suicidal or homicidal ideation, displayed an intact memory and was coherent, but also was suffering from restlessness, anxiety, and distraction.  (Tr. 431, 433, 434-38, 440, 450.)  From January through September of 2007, the care-givers assessed DaVinci's Global Assessment of Functioning (GAF) Score as ranging from 55-60.  (Tr. 430-50.)

In January and February of 2008, medical records reflect that DaVinci's appearance was normal, her hygiene was good, her affect was appropriate, her mood was euthymic, her thought process was coherent, and her memory was intact, but that she exhibited restlessness and difficulty organizing tasks and activities.  (Tr. 456, 458.)  Accordingly, DaVinci was assessed a GAF of 60. (Tr. 459.)  In April 2008, DaVinci's GAF score remained at 60 with coherent thought processes and intact memory, but she exhibited restless motor behavior and labile affect along with difficulty organizing tasks and activities.  (Tr. 461-62.)  In May 2008, her Prozac prescription increased and her behavior was calm with attention and concentration within normal limits.  (Tr. 463-64).  Consequently, by June 2008, her GAF score increased to 65.  (Tr. 585-86.)

These clinical findings, which were inconsistent with the assertion that DaVinci was wholly disabled by these conditions, were further confirmed by the assessments of other medical processionals.  For example, on July 9, 2008, Mitchell Sadar, Ph.D., a state agency physician, issued a mental residual functional capacity assessment finding that DaVinci was not significantly or moderately limited in every category of functioning. (Tr. 485-502.) Dr. Sadar observed that DaVinci's progress notes showed a positive response to treatment with relatively intact mental status.  (Tr. 487.)  He found that her memory intact and concluded that she could perform basic, routine work.  (Tr. 487.)

The ALJ's conclusion that DaVinci's emotional state did not render her wholly disabled in October 2007 was also bolstered by DaVinci's own mixed and equivocal testimony regarding her emotional limitations prior to July 2008.  For example, DaVinci claimed that after a fall she had suffered, she experienced forgetfulness and anxiety, alleged that she could not work or go to the store due to her anxiety, and stated that her condition became worse over time.  (Tr. 39, 68, 73.)  However, DaVinci also admitted that her anxiety predated her accident; (Tr. 60-63, 67-68.), testified that her medications helped address her anxiety issues; and conceded that she was well enough to make and sell jewelry, activities which required significant concentration.  (Tr. 72.)  DaVinci also acknowledged engaging in a range of light activities at home,

stating that she lived with her boyfriend, performed some chores and housekeeping, and was able to drive. (Tr. 68.) The very equivocal nature of DaVinci's psychological symptoms was fruther underscored by function reports completed by DaVinci in October of 2007 and June of 2008, describing her daily activities. (Tr. 266-76, 301-09.) In these reports, DaVinci stated that she spent time watching TV, reading, meditating, writing in her journal, caring for a pet, washing dishes, cleaning laundry, vacuuming, and going for walks. (Tr. 267, 302.) According to DaVinci she also was able to maintain her hobbies of jewelry making, drawing and painting, cross-stitching, and music despite these emotional difficulties. (Tr. 271.) Finally, DaVinci's activity reports indicated that she was able to sustain some level of social interaction despite her anxiety disorder, and stated that she visited her sister, went outside once per day, was able to go out alone, spent time with others talking, shopping, and drove two to three times per week. (Tr. 302, 305, 306.)

Likewise, the information provided by DaVinci's siblings did not compel a finding of disability. While these family members characterized DaVinci as disabled to some degree, they also recited facts which demonstrated some residual capacity for work. For example, in October of 2007, Plaintiff's brother, Joseph King, explained that he saw DaVinci only at holiday gatherings, and reported that she watched TV, made bead bracelets, and went for walks. (Tr. 245.) He reported that she had no

problem with personal care, could prepare her own meals, and cleaned laundry. (Tr. 246-47.) In June of 2008, DaVinci's sister described a level of social functioning by DaVinci that was consistent with some residual functional capacity, stating that she and Plaintiff spent a lot of time together helping each other with daily/weekly errands, and chores, (Tr. 311.), and that DaVinci cared for a pet, had no problems with personal care, prepared her own meals, performed household chores, went out alone, shopped in stores, and engaged in hobbies such as cross-stitching, beading, reading, and watching TV. (Tr. 311-15.)

The ALJ correctly concluded that this evidence showed that the Plaintiff's subjective complaints of a complete and total emotional incapacity were not fully supported by independent diagnostic evidence and testing. Quite the contrary, much of that diagnostic testing either contradicted, or failed to confirm, the severity of the symptoms reported by the Plaintiff. Since "there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged," 42 U.S.C. § 423(d)(5)(A), this evidence, which did not confirm the type of abnormalities which would sustain the Plaintiff's

reports of a total inability to work, constituted "substantial evidence" supporting the ALJ's finding.

In sum, we find that the ALJ's assessment of the competing medical evidence relating to the Plaintiff's alleged psychological impairments rested upon sufficient "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Johnson, 529 F.3d at 200, and, therefore, was supported by "substantial evidence."

DaVinci's attacks on appeal upon this finding are ultimately unpersuasive. For example, DaVinci may not set aside this finding by simply citing the fact that it is reported that she had suffered a decline in her reported IQ from 119 to 86 over the span of many years and arguing that this decline in IQ, standing alone, constitutes proof of disability under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.("Listing 12.02.") As the Defendant aptly notes, a decline in IQ of 15 points or more is simply one factor which must be found under Listing 12.02. To qualify as disabled under these regulations, a claimant must show both a decline in IQ of greater than 15 points *and* at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentrations, persistence, or pace; or (4) repeated episodes of decompensation of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

In short, "an IQ score . . . alone does not meet a listing.  The applicant must also have marked difficulties in two areas or an additional impairment that imposes an 'additional and significant work-related limitation of function.' " <u>Frazier v. Comm'r of Soc. Sec.</u>, 240 F. App'x 495, 497 (3d Cir. 2007).  Here the ALJ concluded that DaVinci had not demonstrated those additional marked or repeated impairments in functioning that are essential to a disability finding under Listing 12.02, and substantial evidence–including DaVinci's statements–supported those findings. Therefore, the ALJ did not err in applying Listing 12.02 in this case.

It is also clear that DaVinci's reported IQ of 86 in 2008, standing alone, did not define her as disabled.  In fact, courts have sustained ALJ findings that claimants retain the residual capacity to work in the face of lower IQ assessments, where, as here the evidence also reveals that the claimant has some functional capacity in the workplace. <u>Frazier v. Comm'r of Soc. Sec.</u>, 240 F. App'x 495, 497 (3d Cir. 2007)(full scale IQ score of 75).  Nor does the other objective measurable score of DaVinci's abilities, her Global Assessment of Functioning, or GAF, score, support a finding of disability here.  In this case, the ALJ correctly noted that the Plaintiff's Global Assessment of Function (GAF) scores typically varied between 60 and 65.  In this regard, it should be noted that GAF scores "in the range of 61-70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school

functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51-60 range indicate [only] moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 F. App'x 898, 900 (3d Cir. 2002). Thus, these objective measures actually contradict a finding of total disability and support a conclusion that DaVinci faced, at most, moderate to mild impairment. See Smith v. Comm'r of Soc. Sec., CIV.A. 10-468 MLC, 2010 WL 4063347 (D.N.J. Oct. 15, 2010). Indeed, the United States Court of Appeals for the Third Circuit has expressly endorsed this type of fact-finding by ALJs in the past, affirming the denial of benefits in cases in which claimants presented lower overall GAF scores. See, e.g., Rios v. Comm'r of Soc. Sec., 444 F. Appx. 532 (3d Cir.2011)(affirming Commissioner where, the record indicated that the plaintiff was assessed three GAF scores at different times of 50, 50, and 50–55 respectively); Gilroy v. Astrue, 351 F. App'x 714 (3d Cir. 2009)(affirming ALJ decision denying disability benefits despite GAF of 45); Glover v. Astrue, CIV.A. 10-901, 2011 WL 1562267 (E.D. Pa. Mar. 31, 2011) report and recommendation adopted, CIV.A. 10-901, 2011 WL 1597692 (E.D. Pa. Apr. 26, 2011(lowest identified GAF rating was 48).

   Thus, it rested in the discretion of the ALJ as fact-finder to give greater weight to the collective, and objective, findings of the treating and examining physicians, and to discount DaVinci's subjective claims of full disability due to mental illness when

setting the onset date for her disability.  Recognizing that the "substantial evidence" standard of review prescribed by statute is a deferential standard of review, <u>Jones v. Barnhart</u>, 364 F.3d 501, 503 (3d Cir. 2004), which is met by less than a preponderance of the evidence but more than a mere scintilla of proof, <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), we find that the ALJ decisions assessing this competing proof regarding the Plaintiff's's ability to function despite her psychological impairments was also supported by substantial evidence and may not now be disturbed on appeal. Moreover, acknowledging that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility," <u>Frazier v. Apfel</u>, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000), we find that there is also substantial evidence supporting the credibility determinations made by the ALJ who assessed DaVinci's testimony in 2009 and 2010.  That credibility determination was fatal to DaVinci's demand for an earlier onset date for her disability, and under the deferential standard of review employed by this Court, remains fatal to this appeal.

### C. The ALJ's Decision Appropriately Addressed the Medical Evidence

Beyond being adequately supported by the evidence, the ALJ's decision must must also be accompanied by "a clear and satisfactory explication of the basis on

which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Id. at 706-707.  Thus, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

In this case, DaVinci alleges that the ALJ failed to adequately consider and discuss the opinion of her treating physician, Dr. Mira, when determining the onset date for her disability.  We disagree.  In Morales v. Apfel, 225 F.3d 310  (3d Cir. 2000), the Court of Appeals for the Third Circuit set forth the standards for evaluating the opinion of a  physician stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer [v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)] (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987)); see also Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir.1994);  Jones, 954 F.2d at 128; Allen v. Bowen, 881 F.2d 37, 40-41 (3d Cir.1989);  Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Brewster, 786 F.2d at 585.  Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).  The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  See Adorno, 40 F.3d at 48.  In

28

> choosing to reject the treating physician's assessment, an ALJ may not
> make "speculative inferences from medical reports" and may reject "a
> treating physician's opinion outright only on the basis of contradictory
> medical evidence" and not due to his or her own credibility judgments,
> speculation or lay opinion.  Plummer, 186 F.3d at 429; Frankenfield v.
> Bowen, 861 F.2d 405, 408 (3d Cir.1988); Kent, 710 F.2d at 115.

Id. at 317-318.

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight.  20 C.F.R.  § 416.927(d)(2). When the opinion of a treating physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered. The Regulations state:

> Generally, the longer a treating source has treated you and the more times
> you have been seen by a treating source, the more weight we will give to
> the source's medical opinion. When the treating source has seen you a
> number of times and long enough to have obtained a longitudinal picture
> of your impairment, we will give the source's opinion more weight than
> we would give it if it were from a non-treating source.

20 C.F.R.  § 416.927(d)(2)(i).

Additionally, the nature and extent of the treatment relationship is considered. The Regulations state:

> Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it  less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

20 C.F.R.  § 416.927(d)(2)(ii).

Furthermore, it is well-settled that an ALJ may assign little weight to physician's terse notation on a disability form, particularly when other medical records of that doctor tell a different and more complete story.  See Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (two-page New Jersey Division of Rehabilitation form on which treating physician merely "check[s] boxes" and "fill[s] in blanks" was "weak evidence at best"); accord Plummer v. Apfel, 186 F.3d 422, 429-430 (3d Cir. 1999).

Here, we find that the ALJ properly applied these benchmarks when assessing the medical evidence received in this case, and Dr. Mira's medical opinion.  To the extent that the doctor's disability assessment was largely expressed simply on a check box form, that opinion was entitled to little weight.  Moreover, DaVinci's treatment records, and her numerous GAF scores compiled by her care-givers, also undermined

this disability assessment.  This medical evidence, therefore, constituted precisely the type of countervailing proof which is sufficient to allow an ALJ to reject a treating doctor's opinion.  See Whitten v. Commissioner, 171 F. App'x 380, 381 (3d Cir. 2006)(denying disability claim in case involving hepatitis where other countervailing medical evidence contradicted treating physician's opinion.)

Furthermore, DaVinci's own account of her activities and capabilities was in some respects inconsistent with Dr. Mira's assessment.  Finally, other medical professionals, viewing the same clinical evidence, reached contrary conclusions.  For example, on July 9, 2008, Mitchell Sadar, Ph.D., a state agency physician, issued a mental residual functional capacity assessment finding that DaVinci was not significantly or moderately limited in every category of functioning.  (Tr. 485-502.) Dr. Sadar observed that DaVinci's progress notes showed a positive response to treatment with relatively intact mental status.  (Tr. 487.)  He found that her memory intact and concluded that she could perform basic, routine work.  (Tr. 487.)

Since the ALJ's decision adequately addressed this conflicting and equivocal medical evidence, the medical evidence cited in this appeal did not suggest that the ALJ's ultimate conclusion was unsupported by substantial evidence, and there is no legal requirement that the ALJ discuss "every tidbit of evidence included in the record."  Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004), this argument does not

provide grounds for setting aside the ALJ's judgment when we scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).  In sum, in this case we find that the ALJ's decision provided a full and complete statement of the evidence, individually assessed that evidence, and adequately explained which proof it found persuasive, and which evidence it discounted.  At bottom, this assessment reflected the view of the fact-finder that DaVinci's claims regarding the date of onset of her disability were not fully credible in light of her own inconsistent statements, and the medical evidence contradicting these subjective claims.  These credibility determinations, in turn, are matters where "an ALJ's findings . . . are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Therefore, we should not disturb these determinations on appeal.

### III.   **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the

Plaintiff's complaint be dismissed for the failure to state a claim upon which relief can

be granted, and the Commissioner's decision be upheld.

The Plaintiff is further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in 28
> U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition
> of a prisoner case or a habeas corpus petition within fourteen (14) days
> after being served with a copy thereof. Such party shall file with the clerk
> of court, and serve on the magistrate judge and all parties, written
> objections which shall specifically identify the portions of the proposed
> findings, recommendations or report to which objection is made and the
> basis for such objections. The briefing requirements set forth in Local
> Rule 72.2 shall apply. A judge shall make a de novo determination of
> those portions of the report or specified proposed findings or
> recommendations to which objection is made and may accept, reject, or
> modify, in whole or in part, the findings or recommendations made by the
> magistrate judge. The judge, however, need conduct a new hearing only
> in his or her discretion or where required by law, and may consider the
> record developed before the magistrate judge, making his or her own
> determination on the basis of that record. The judge may also receive
> further evidence, recall witnesses or recommit the matter to the
> magistrate judge with instructions.

Submitted this 21st day of September 2012.

***S/Martin C. Carlson***
Martin C. Carlson
United States Magistrate Judge
